IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CENTRAL OREGON LANDWATCH,                    Case No. 6:13-cv-02027-AA
an Oregon non-profit corporation,                 OPINION AND ORDER
et. al.

      Plaintiffs,

   v.

KENT CONNAUGHTON, in his official
capacity as Regional Forester of
the Deschutes National Forest,
JOHN ALLEN, in his official
capacity as Forest Supervisor of
the Deschutes National Forest, and
the UNITED STATES FOREST SERVICE,
a federal agency,

      Defendants,

   v.

THE CITY OF BEND,

      Defendant-
      Intervenor.

---

Ralph Bloemers
Christopher Winter
Crag Law Center
917 S.W. Oak Street, Suite 417
Portland, Oregon 97205
    Attorneys for plaintiffs

Page 1 - OPINION AND ORDER

S. Amanda Marshall
United States Attorney
Stephen J. Odell
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204
    Attorneys for defendant

Teresa Jacobs
Albert Ferlo (pro hac vice)
Perkins Coie LLP
700 Thirteenth Street N.W.
Washington, DC 20005
    Attorneys for defendant-intervenor

AIKEN, Chief Judge:

Plaintiffs Central Oregon Landwatch and Waterwatch of Oregon move for summary judgment pursuant to Fed. R. Civ. P. 56. Defendant United States Forest Service("Forest Service") and defendant-intervenor City of Bend ("City") each filed cross-motions for summary judgment.[1] The Court held oral argument on October 30, 2014. For the reasons set forth below, the plaintiffs' motion is denied and the defendants' motions are granted.

## BACKGROUND

This dispute surrounds Tumalo Creek (the "Creek"), a tributary of the Deschutes River that runs through the City. Specifically, plaintiffs challenge the Forest Service's decision to issue a special use permit (SUP) allowing the City to construct a new water supply pipeline allowing continued diversion of water from the Creek. The Bridge Creek Water Supply Project (the "Project"), would

---

[1]In August 2014, this Court granted motions allowing several parties to appear as amici curiae, including Oregon Water Utilities Council, League of Oregon Cities, Special Districts Association of Oregon, Oregon Water Resources Congress, and Oregon Water Resources Department.

Page 2 - OPINION AND ORDER

allow the City to install an approximately 10-mile long, single replacement pipe under an existing road. Administrative Record ("AR") 50372. The City sought to replace its existing water supply system because the two deteriorating pipelines "are in poor condition and [] at risk of failure." Id.

On September 18, 2012, the Forest Service initially approved the issuance of a SUP allowing the City to construct the pipeline, however the project was enjoined by Cent. Or. Landwatch v. Connaughton (Landwatch I), 905 F. Supp. 2d 1192 (D. Or. 2012). The Forest Service and City then produced a second Environmental Assessment (the "2013 EA") that included a temporary limit on the amount of water diversion, which the City alleges is equivalent to its current level of diversion. The more than two-hundred page 2013 EA addresses the environmental impacts of the Project in detail, including its effect on the Creek's streamflow and temperature. To assess the Project's impacts, the Forest Service divided the Creek into three separate "reaches." Reach A consisted of 13.2 miles between the confluence of the Tumalo and Bridge Creeks and the point where the Tumalo Irrigation District ("TID") withdraws water for its system. AR 50460. The impact of the City's water withdrawal occurs in Reach A. AR 50462. Reach B covers the portion of the Creek from the TID diversion point to the mouth of the Tumalo Creek. AR 50460. Lastly, Reach C extends from the mouth of Tumalo Creek into the Deschutes River. Id.

Based on their findings, the Forest Service approved the City's renewed request for a SUP. Plaintiffs challenged this

Page 3 - OPINION AND ORDER

decision via administrative protest and filed several objections to the agency's decision. AR 50753. In October 2013, the Forest Service responded to plaintiffs' protests and affirmed its decision to proceed with the Project. AR 50753-55. After exhausting their administrative remedies, plaintiffs filed a complaint in this Court, alleging that the 2013 EA and the Forest Service's decision to issue a SUP violates the National Environmental Policy Act ("NEPA"), the National Forest Management Act ("NFMA"), the Clean Water Act ("CWA"), and the Federal Land Policy Management Act ("FLPMA").

## STANDARD

A federal agency's compliance with environmental laws is reviewed under the Administrative Procedure Act ("APA"). 5 U.S.C. § 706. In an APA case, summary judgment is awarded in favor of the plaintiff if, after reviewing the administrative record, the court determines that the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Natural Res. Def. Council v. Nat'l Marine Fisheries Serv., 421 F.3d 872, 877 (9th Cir. 2005) (quoting 5 U.S.C. § 706(2)(A)). A decision is not arbitrary or capricious if the federal agency articulated a rational connection between the facts found and the choice made. Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs, 384 F.3d 1163, 1170 (9th Cir. 2004); Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989) (courts examine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment").

Page 4 - OPINION AND ORDER

Review under this standard is narrow and the court may not substitute its judgment for that of the agency.  Morongo Band of Mission Indians v. Fed. Aviation Admin., 161 F.3d 569, 573 (9th Cir. 1988).  Nevertheless, while this standard is deferential, the court must "engage in a substantial inquiry, . . . a thorough, probing, in-depth review."  Native Ecosys. Council v. U.S. Forest Serv., 418 F.3d 953, 960 (9th Cir. 2005) (citation and internal quotations omitted).

## DISCUSSION

I.   NEPA Claims

Plaintiffs argue that the Forest Service violated NEPA by failing to: (1) take a "hard look" at the Project's effects on the Creek; (2) conduct an adequate alternatives analysis; (3) use adequate baseline data; and (4) prepare an environmental impact statement (EIS). For the reasons set forth below, the Court finds that the Forest Service's NEPA analysis was not arbitrary or capricious.

A. Requirements

NEPA is "a procedural statute that does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." Sierra Club v. Bosworth ("Sierra Club I"), 510 F.3d 1016, 1018 (9th Cir. 2007) (citation and internal quotations omitted).  To accomplish a "hard look," NEPA requires all agencies to prepare an EIS for any "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. §

4332(2)(C).

The agency first prepares an environmental assessment ("EA") to determine whether an action will be significant; if the agency concludes there is no significant effect associated with the proposed action, it may issue a Finding Of No Significant Impact, "accompanied by a convincing statement of reasons to explain why a project's impacts are insignificant," in lieu of preparing an EIS. Sierra Club I, 510 F.3d at 1018 (citation and internal quotations omitted); 40 C.F.R. § 1508.9. Thus, an EA "need not be extensive." Grand Canyon Trust v. U.S. Bureau of Reclamation, 623 F. Supp. 2d 1015, 1026 (D. Ariz. 2009).

B. Analysis

    i.   Failure to Take a Hard Look

In assessing whether the agency took the requisite "hard look," the court considers whether the agency's EA contains "a reasonably thorough discussion" of the significant aspects of the probable environmental consequences of the proposed action. See Nat'l Parks & Conservation Ass'n v. BLM, 606 F.3d 1058, 1072 (9th Cir. 2010), cert. denied, 131 S. Ct. 1783 (2011) (citation and internal quotations omitted). Plaintiffs contend that the 2013 EA is erroneous because it did not consider the Project's effects if the City diverted more than 18.2 cfs of water. In addition, plaintiffs assert that the Forest Service failed to evaluate how the Project "will impact Tumalo Creek in light of changing climatic conditions." Pls.' Mem. in Supp. of Mot. Summ. J. 14.

Initially, the Forest Service was not required to consider the

direct impact of flows greater than 18.2 cfs because that action was not permitted and is not proposed. AR 50834. Thus, plaintiffs may argue only that the Forest Service failed to consider the indirect or cumulative impacts of the Project if the City diverted more than 18.2 cfs. Regarding NEPA's indirect impact requirement, the Forest Service did not need to "account for potential growth effects that might be caused by a project if the project is exclusively intended to serve a much more limited need." Ctr. for Envtl. L. & Policy v. U.S. Bureau of Reclamation, 655 F.3d 1000, 1011 (9th Cir. 2011) (citation omitted) (agency did not need to consider indirect effects of water withdrawal above a project's stated limit).

Further, the Forest Service was not required to analyze the cumulative impacts of withdrawing more than 18.2 cfs because that action is not reasonably foreseeable. See AR 50835 ("actual operation authorized by this decision would not exceed 18.2 cfs and can reasonably be expected to be less than that for at least the foreseeable future during substantial parts of the year when the City does not need that much water or its rights are being constrained by water rights distribution"). The issuance of a SUP allowing the diversion of more than 18.2 cfs at some point in the future is speculative and therefore does not need to be analyzed for potential cumulative impacts. Vt. Yankee Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 534 (1978) (NEPA does not mandate a "crystal ball" inquiry) (citation and internal quotations omitted).

Even assuming the City may eventually decide it needs more than the allotted 18.2 cfs of water, the Forest Service must first approve another SUP which would then trigger a new round of environmental review and public input, including NEPA analysis. Even if an "EA does not discuss the cumulative impact of reasonably foreseeable projects," the EA is not deficient because the agency "has committed itself to scrutinizing the cumulative effects of the [future decision] . . . before implementing any action resulting from the [future decision]." Ctr. for Envtl. L. & Policy, 655 F.3d at 1005. "[U]se of the expanded [water withdrawal] capacity remains both firmly in the control of [the agency] and is subject to review in a future EA or EIS." Id. at 1012.

The Forest Service also properly analyzed the Project's impact on climate change. Plaintiffs' allege that the Forest Service misapplied its own guidance and should have used available quantitative tools to assess the Project's impact. Regarding the former, the documents plaintiffs rely on are not judicially enforceable because they are merely guidance documents. Western Radio Servs. Co. v. Espy, 79 F.3d 896, 900-01 (9th Cir. 1996). Furthermore, the Forest Service was not required to use plaintiffs' preferred methodology. During the NEPA process, plaintiffs and their experts advised the Forest Service of a quantitative approach that they preferred for climate change analysis. However, NEPA does not "require us to resolve disagreements among various scientists as to methodology." Friends of Endangered Species, Inc. v. Jantzen, 760 F.2d 976, 986 (9th Cir. 1985). The Forest Service conducted a

Page 8 - OPINION AND ORDER

sufficient analysis  for the purposes of NEPA. See AR 50600-02, AR 50851-52. The agency relied on data that permitted a "reasonably thorough discussion" of the Project's climate change impacts and therefore satisfied NEPA.

ii.  Failure to Consider Adequate Alternatives

Plaintiffs' contend the Forest Service impermissibly refused to consider an adequate range of alternatives. They argue the Project's purpose and need statement was "unreasonably narrow" and, even assuming the statement was reasonable, the agency incorrectly decided that plaintiffs' proposals did not satisfy the Project's purpose.

Contrary to plaintiffs' assertion, the Court finds that the Forest Service's definition of the Project's purpose and need was reasonable. A purpose and need statement must "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. An agency's purpose and need statement is entitled to deference and will be dismissed if it "unreasonably narrows the agency's consideration of alternatives so that the outcome is preordained." Alaska Survival v. Surface Transp. Bd., 705 F.3d 1073, 1084 (9th Cir. 2013) (citation omitted). The Forest Service determined that the purpose of the SUP was to use national forest lands for planned upgrades to the City's existing water supply system. AR 50376. This broad statement reasonably captured the goal of the SUP and did not foreclose the Forest Service's ability to consider a range of alternatives.

Page 9 - OPINION AND ORDER

Further, an agency is not required to consider alternatives that are not feasible in light of a proposed action's purpose or need. Alaska Survival, 705 F.3d at 1087. Plaintiffs allege the Forest Service impermissibly dismissed several of their proposed alternatives and only analyzed two options in detail - the preferred alternative and the no action alternative. NEPA demands that an agency briefly explain why it rejected certain alternatives and that is exactly what the Forest Service did. 40 C.F.R. § 1502.14(a). In the 2013 EA, the agency examined a number of different alternatives, but declined to discuss certain options in detail because they did not satisfy the Project's purpose and need. AR 50402-11. For example, the Forest Service considered a "short pipe" alternative but found that it would pose a threat to water quality and undeveloped forest lands. AR 50407-08. The 2013 EA contained over twenty pages devoted to alternatives analysis. AR 50402-428. The agency properly provided an explanation for each proposed alternative and its decision regarding the most reasonable alternatives is entitled to deference. See Native Ecosys. Council v. U.S. Forest Serv., 428 F.3d 1233, 1245-46 (9th Cir. 2005).

Plaintiffs also argue the Forest Service's "no action" alternative analysis was inadequate. NEPA requires a federal agency to consider a no action alternative, which involves comparing the consequences of a proposed action against the status quo. See Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin., 126 F.3d 1158, 1188 (9th Cir. 1997). Plaintiffs allege that the Forest Service incorrectly presumed the no action baseline was the City's

continued diversion of 18.2 cfs because the City's current SUP will expire in less than five years.[2] They assert that the appropriate no action alternative was the discontinuation of the current water system. However, the Forest Service explained that "the no action alternative is best represented by current conditions, including the City's current system that has been in place now for decades . . . not the environmental conditions that may have been in existence prior to the beginning of diversions in the 1920s." AR 50845. Further, there is no reason to presume that when the City's current SUP expires, the Forest Service would not renew it as it has in years past. See Ass'n of Pub. Agency Customers, 126 F.3d at 1188 ("The 'no action' alternative examined...which involve[d] continuing its present power sales contracts, [was] a proper 'no-action' alternative.") Although plaintiffs would have liked the Forest Service to consider a discontinuation of the existing system, it was not arbitrary or capricious for the agency to conclude that the City's current system represented the status quo. See Akiak Native Cmty. v. U.S.P.S., 213 F.3d 1140, 1148 (9th Cir. 2000).

### iii. Failure to Use Adequate Baseline Data

Plaintiffs next argue that the EA is erroneous because the Forest Service relied on inadequate streamflow baseline data in assessing the Project's environmental impacts. While the Court

---

[2] Plaintiffs also assert that 18.2 cfs is an unsubstantiated amount, however the record supports the Forest Service's decision to apply that figure, as discussed in further detail in the following section.

found that reliance on a similar data set was insufficiently justified in Landwatch I, 905 F. Supp. 2d at 1197, the Forest Service has now explained its choice of data set and supported it with expert scientific opinion. The agency explained that the data set it relied on "represents the longest, most complete, and accurate data set available for Tumalo Creek." AR 50713-14. Plaintiffs allege this data does not address the extreme droughts in recent years, however the agency explained that the data set it used actually included drought cycles similar to recent droughts. Id. The Forest Service also noted that more recent data is unreliable due to "issues with gauge operation and location." AR 50467. Even assuming plaintiffs' assertion that "more recent data would likely lead to a different result" is something more than conjecture, this is insufficient to overcome the "substantial deference" standard which must be accorded the Forest Service's selection of an appropriate baseline data set. See Native Ecosys. Council v. Weldon, 697 F.3d 1043, 1053 (9th Cir. 2012) (citation omitted).

Moreover, the Court finds that the Forest Service provided an adequate baseline of 18.2 cfs for the City's water diversion rate. Under NEPA, a federal agency must only provide enough information to promote "a reasoned choice among alternatives." 40 C.F.R. § 1502.22. Nonetheless, plaintiffs contend the Forest Service incorrectly estimated the City's baseline diversion and use rates. They assert the agency needed to collect additional data to determine the appropriate diversion baseline. Plaintiffs fail to

Page 12 - OPINION AND ORDER

offer sufficient evidence to prove that the agency's existing data violated NEPA and "an agency's selection of a particular baseline [does] not prevent it from complying with NEPA." <u>Theodore Roosevelt Conservation P'ship v. Salazar</u>, 605 F. Supp. 2d 263, 281 (D.D.C. 2009) (citation omitted).

    iv.  <u>Failure to Prepare an EIS</u>

NEPA requires a federal agency to prepare an EIS for "all major Federal actions significantly affecting the quality of the human environment." <u>Blue Mts. Bio. Proj. v. Blackwood</u>, 161 F.3d 1208, 1212 (9th Cir. 1998) (citation and internal quotations omitted). In assessing a project's significance, both its context and intensity are evaluated. 40 C.F.R. § 1508.27. The context varies depending on the scope of the project. <u>Id.</u> The intensity, or the "severity of the impact" of the proposed action, should be evaluated based on a number of "significance" factors. <u>See</u> 40 C.F.R. § 1508.27(b)(1)-(10). A court may find substantial risk of a significant effect based on just one of these factors. <u>Ocean Advocates v. U.S. Army Corps of Eng'rs</u>, 402 F.3d 846, 865 (9th Cir. 2004). Plaintiffs argue that a number of these significance factors weigh in favor of preparation of an EIS for the Project, including: (1) the Project threatens violations of federal and state law; (2) a substantial controversy exists; environmental effects remain uncertain; (3) the Project area has unique characteristics; (4) the Project sets a precedent for future actions; and (5) the Project may affect threatened and sensitive species.

Plaintiffs focus on the first significance factor, however,

Page 13 - OPINION AND ORDER

this factor fails to establish that an EIS was necessary. In several letters, the Oregon Water Resources Department stated that the City is in compliance with state law and did not require additional permits to operate its diversion facility. AR 10732, AR 11541, AR 50764. This evidence is sufficient to reject plaintiffs' argument and the Court finds that the City's diversion is not in violation of state law. Further, despite plaintiffs' numerous allegations, it was not arbitrary or capricious for the Forest Service to conclude that the Project would not have a significant impact on the environment. An independent review of the record makes it clear that each of plaintiffs' remaining claims are without merit. See, e.g., AR 50800-06, AR 50857-58.

II.  NFMA Claims

    A. Requirements

The NFMA, 16 U.S.C. §§ 1600 et seq., establishes both procedural and substantive requirements for the management of National Forest System lands. Under the NFMA, the Forest Service is required to manage the Deschutes National Forest pursuant to the Deschutes Land and Resource Management Plan ("LRMP"). The Forest Service may not approve any site-specific actions, such as the Project, that are inconsistent with the Deschutes LRMP. 16 U.S.C. § 1604(i). The LRMP "was developed to guide all natural resource management activities and establish standards/guidelines for the Deschutes National Forest." AR 01502. The Plan contains various provisions related to the maintenance and enhancement of riparian areas and fisheries. See, e.g., AR 01592-93, AR 01599. The Inland

Page 14 - OPINION AND ORDER

Native Fish Strategy (INFISH) and the Northwest Forest Plan (NWFP) amended the Deschutes LRMP and provide additional guidelines with respect to aquatic habitats and riparian resources.

B. Analysis

    i. Minimum Instream Flows

Plaintiffs contend that the Forest Service violated NFMA by issuing a SUP that was inconsistent with the Deschutes LRMP.[3] Specifically, plaintiffs argue the agency was required to set minimum instream flow levels based on the State of Oregon's instream water right for the Creek.[4] In support of this argument, plaintiffs cite numerous planning directives from the Deschutes LRMP, the NWFP, and INFISH. They allege these standards and guidelines placed a "binding commitment" on the Forest Service to impose minimum instream flow requirements for the Creek prior to issuing the City's SUP.

As a preliminary matter, the majority of these cited guidelines cannot form a basis for judicial review because they are barred by the Supreme Court's decision in Norton v. Southern Utah

---

[3] Plaintiffs also allege the Forest Service's decision violated FLPMA. FLPMA requires the Forest Service to condition rights-of-way such that they will "minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment." 43 U.S.C. § 1765(a)(ii). The statute does not require the Forest Service to undertake any specific actions, thus plaintiffs' FLMPA claim is similarly dismissed.

[4] An Instream Water Right (ISWR) is "a water right held in trust by the Water Resources Department for the benefit of the people of the State of Oregon." Or. Rev. Stat. § 537.332(3) (1987). ISWRs establish minimum streamflow levels that are necessary to restore or maintain the State's riparian resources.

Page 15 - OPINION AND ORDER

<u>Wilderness Alliance</u>, 542 U.S. 55 (2004) ("SUWA"). It is undisputed that plaintiffs can proceed only if they allege the Forest Service "failed to take a <u>discrete</u> agency action that [the agency] is <u>required to take</u>." <u>Id.</u> at 64 (emphases in original). Therefore, the forest-wide standards and guidelines plaintiffs cite are "generally not amenable to suit under the APA because they do not constitute final agency actions." <u>Ecology Ctr. v. Castaneda</u>, 574 F.3d 652, 658 (9th Cir. 2009) (citation omitted). Plaintiffs contend these provisions contain a "clear indication of binding commitment," such that the Court may compel the Forest Service's action. <u>SUWA</u>, 542 U.S. at 69. However, a plain reading of the cited provisions contradicts plaintiffs' argument. Accordingly, the Court may only review plaintiffs' claims as they relate to site-specific compliance with the LRMP, the NWFP, and INFISH. <u>See Ecology Ctr.</u>, 574 F.3d at 658 (citation omitted).

The Court finds that only five of the fifteen planning directives plaintiffs cite are site-specific provisions subject to judicial review – Deschutes LRMP RP-9, NWFP LH-2 & LH-3, & INFISH LH-1 & LH-3. However, on their face, these management directives do not impose a duty on the Forest Service to set minimum instream flow requirements for the Creek. Pls.' Reply Mem. in Supp. of Mot. Summ. J. 6-8. For example, the Deschutes LRMP RP-9 regulation requires the Forest Service to "[p]rotect instream flow on National Forest System Lands." Plaintiffs, however, interpret this provision to mean the agency had a duty to establish minimum streamflow levels before issuing the SUP. While the Forest Service had a duty

to protect the Creek's instream flows, it was not required to adopt plaintiffs' specific recommendations on how to do so. See SUWA, 542 U.S. at 66 (environmental regulation was "mandatory as to the object to be achieved," but allowed agency discretion in deciding how to achieve it). Further, the Forest Service's "interpretation and implementation of its own forest plan is entitled to substantial deference." Weldon, 697 F.3d at 1056 (citation omitted). Accordingly, plaintiffs' argument that the Forest Service had a duty to establish minimum instream flow requirements is without merit.

Moreover, an independent review of the record reveals that the Forest Service considered the Creek's instream flow needs prior to issuing the SUP, as NFMA mandates. The Forest Service evaluated the Creek's current streamflow conditions, including minimum instream flows, and the Project's potential impact on the Creek. AR 50469-81. The agency concluded that instream flows under the Project would be sufficient to protect riparian resources and aquatic habitats. The EA examined flows in all three reaches of the Creek and determined that the Project would not reduce streamflow levels in Reaches B and C compared to the City's current system. AR 50480-81. In Reach A, however, the Project would improve instream flows if the City diverts less than 18.2 cfs. AR 50479. Additionally, the Forest Service analyzed how changes in streamflow would impact spawning, juvenile, and adult fish habitat. The agency relied on the "most widely accepted and applied fish habitat model" and found

that the Project would have little to no impact on the Creek's aquatic habitats. AR 50499, AR 50850.

Plaintiffs, however, argue this streamflow analysis was inadequate because the Forest Service's interpretation of minimum instream flows "had nothing to do with the needs of riparian resources, but rather, simply reflected [the City's] senior instream right." Pls.' Reply Mem. in Supp. of Mot. Summ. J. 10. In other words, plaintiffs argue the Forest Service should have relied on the minimum flow levels established in the Creek's ISWR, rather than the minimum flows based on the City's more senior water rights. Plaintiffs cite Cnty. of Okanogan v. Nat'l Marine Fisheries Serv., 347 F.3d 1081 (9th Cir. 2003), Trout Unlimited v. USDA, 320 F. Supp. 2d 1090 (D. Colo. 2004), and Sequoia Forestkeeper v. U.S. Forest Serv., No. CV F 09-392 LJO JLT, 2010 WL 5059621 (E.D. Cal. Dec. 3, 2010) to support their position. In each of these cases, the court held that the Forest Service had the authority to impose instream flow requirements even though this would conflict with a permitee's state water rights. Plaintiffs assert that these cases establish the Forest Service's authority to evaluate the Project using the Creek's ISWR minimum flows and condition the City's SUP accordingly. This Court is not persuaded by these cases.

In County of Okanogan, the Ninth Circuit held that the Forest Service could impose instream flow requirements because certain flows were required to protect endangered species. Cnty. of Okanogan, 347 F.3d at 1084-85. However, the Creek does not have any threatened or endangered species. AR 04677, AR 50388. Further, in

Page 18 - OPINION AND ORDER

Trout Unlimited and Sequoia Forestkeeper, the Forest Service did not impose instream flow restrictions although evidence suggested the proposed actions could adversely affect fish and wildlife habitat. See Trout Unlimited, 320 F. Supp. 2d at 1106; Sequoia Forestkeeper, 2010 WL 5059621 at *20-21. Here, the Forest Service did place restrictions on the City's water use to minimize adverse environmental impacts.

Collectively, these cases illustrate that the Forest Service is entitled to impose flows that conflict with state water rights, but it is not required to do so. Unlike those cases, the Forest Service did not need to establish minimum flows because limiting the City's diversion to 18.2 cfs was sufficient to protect the Creek's resources. Consequently, the Forest Service was not required to reprioritize the Creek's ISWR over the City's consumptive rights in its streamflow analysis.

Finally, as a practical matter the ISWR minimum instream flow levels will generally be met in Reach A if the Project is implemented.[5] AR 50479. Other than two months of the year, the portion of the Creek primarily affected by the City's withdrawal will be in compliance with this state water right. Plaintiffs would like the Court to focus on the streamflow inadequacies in Reach B, however the 2013 EA is clear that flows in this portion of the Creek

---

[5] The Court notes that the minimum flows in the Creek's ISWR are higher than the actual minimum levels required to protect fish habitats. When Oregon issued the Creek's ISWR it adopted flow levels that were higher than previously identified minimum flows. AR 04995, AR 49914-15, AR 49917.

Page 19 - OPINION AND ORDER

are more influenced by the Tumalo Irrigation District's management and practices. AR 50481.

ii. INFISH

INFISH amended the Deschutes LRMP with respect to water quality. The goal of the INFISH guidelines is to "maintain and restore" riparian resources, ecosystem health and fish populations. The standard under INFISH is not to "retard attainment of water quality standards." Specifically, one INFISH riparian management objective ("RMO") requires the Forest Service to protect the stream by ensuring "[m]aximum water temperature below 59ºF within adult holding habitat and below 48ºF within spawning and rearing habitats." AR 04519.

Plaintiffs argue that the Creek is currently violating these temperature standards and the Project will cause continued violations. Conversely, the Forest Service argues that the Project does not violate INFISH because it will not "retard" attainment of RMOs. The Court finds that the Project, now limiting the City's diversion to 18.2 cfs, does not violate INFISH. The Forest Service determined the Project would not prevent attainment of RMOs and explained its conclusion in the 2013 EA. For instance, the agency found that the Project "decreases temperature in [Reach A], trending toward <u>attainment</u> of [the] objective." AR 50549 (emphasis added); <u>see also</u> AR 50552-50556. Further, in <u>Landwatch I</u> this Court noted that the 2013 EA did not address INFISH compliance during critical summer months. <u>Landwatch I</u>, 905 F. Supp. 2d at 1197. The 2013 EA, however, explains that the Project would provide benefits to the

Page 20 - OPINION AND ORDER

Creek's water temperature during the hottest months. AR 50550. Moreover, the Forest Service provided a detailed analysis of the Project's impact on fisheries and found that it would not adversely affect native fish. AR 50525-50537. Considering the applicable standard, it was not a clear error of judgment for the Forest Service to conclude that the Project complied with INFISH.

The Forest Service did not act arbitrarily or capriciously in determining that the Project was consistent with its obligations under NFMA.

III. CWA Claim

A. Requirements

The CWA was enacted to "restore and maintain the chemical, physical, and biological integrity of [the] Nation's waters." 33 U.S.C. § 1251(a). Under the CWA, federal agencies are required to comply with state water-quality standards "in the same manner, and to the same extent as any nongovernmental entity." 33 U.S.C. § 1323(a).

B. Analysis

Plaintiffs argue the Forest Service violated the CWA because the Project violates Oregon's Protecting Cold Water (PCW) standard. Defendants contend plaintiffs' claim fails because the PCW does not apply to the Project. The Forest Service argues that because Tumalo Creek remains on the CWA 303(d) list for high temperatures it cannot be subject to a standard created to protect or preserve cold water.

Further, the City contends the PCW is inapplicable because only discharges of water are subject to state water quality standards.

Even accepting plaintiffs' argument that the PCW applies here, the Court finds that the Forest Service did not violate the CWA. The agency determined that the PCW standard did not apply because the Project satisfied an exception to the rule. The PCW does not apply if "[t]here are no threatened or endangered salmonids currently inhabiting the water body; [t]he water body has not been designated as a critical habitat; and [t]he colder water is not necessary to ensure that downstream temperatures achieve and maintain compliance with the applicable temperature criteria." Or. Admin. R. 340-041-0028(11)(c). Here, the Forest Service determined that all three criteria were met and "Tumalo Creek is not subject to or in violation of this State water quality standard." AR 50492. Plaintiffs assert this was an unsupported conclusion and the Forest Service failed to provide a sufficient explanation for why the colder water in Tumalo Creek is not necessary to achieve and maintain temperature standards downstream.

Plaintiffs' claim is without merit. In the 2013 EA, the Forest Service explained that Reach C is not significantly impacted by Tumalo Creek's temperature because its "contribution is small, and does not contribute enough cold water to the main stem of the Deschutes River to attain temperature standards on its own." AR 50494. Moreover, the agency noted that at the mouth of the Tumalo Creek, which feeds into the Deschutes River, the temperature difference between the proposed and existing water supply system is

Page 22 - OPINION AND ORDER

less than 0.1°C. Considering this negligible difference, the record supports the Forest Service's conclusion that Tumalo Creek waters are not necessary to ensure colder temperatures downstream in the Deschutes River.

Further, to the extent plaintiffs' argue that colder Tumalo Creek water upstream is necessary for non-attaining waters in Reach B, this argument also fails. The record shows that the flow and temperatures downstream of the Project area are "controlled primarily by the operation of TID's irrigation diversions - not the municipal use of water." AR 50494. The Forest Service further explained that regardless of the City's demand, TID's water management primarily controls flows in Reach B and temperatures are not expected to change as a result of the Project. AR 50487. Consequently, it was not a clear error in judgment for the Forest Service to conclude that the Creek's colder water was not necessary to "ensure downstream temperatures achieve or maintain compliance with applicable temperature criteria." The Court finds no violation of the CWA.

**CONCLUSION**

The Forest Service's and defendant-intervenors' motions for summary judgment (docs. 119, 114, respectively) are GRANTED. The plaintiffs' motion for summary judgment (doc. 100) is DENIED. This case is DISMISSED and all pending motions are denied as moot.

IT IS SO ORDERED.
     Dated this _5th_ of December 2014.


                    _Ann Aiken_
                    Ann Aiken
           United States District Judge

Page 24 - OPINION AND ORDER